**ORAL ARGUMENT NOPet.T YET SCHEDULED**

No. 23-1069,
*(consolidated with* No. 23-1071)

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

HEALTHY GULF, *et al.*,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*,

COMMONWEALTH LNG, LLC,
*Respondent-Intervenor.*

_____

On Petition for Review of Orders of the Federal Energy Regulatory Commission
_____

**BRIEF FOR RESPONDENT-INTERVENOR COMMONWEALTH LNG, LLC**

_____

Thomas Smith
COMMONWEALTH LNG, LLC
General Counsel, Chief Compliance Officer
One Riverway, Suite 500
Houston, TX 77056
Phone: 346.652.4444
Email: tsmith@teamcpl.com

John Longstreth
David L. Wochner
Timothy J. Furdyna
K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
Phone: 202.778.9000
Email: john.longstreth@klgates.com
    david.wochner@klgates.com
    tim.furdyna@klgates.com

*Counsel for Respondent-Intervenor
Commonwealth LNG, LLC*

*Counsel for Respondent-
Intervenor Commonwealth LNG, LLC*

_____

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

The Respondent-Intervenors adopt the Certificate as to Parties, Rulings, and Related Cases in the Federal Energy Regulatory Commission's brief.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and District of Columbia Circuit Rule 26.1, Respondent-Intervenor submits the following required Disclosure Statement:

Commonwealth LNG, LLC ("Commonwealth"), a Delaware limited liability company, certifies through undersigned counsel that it is a Texas limited liability company with its principal place of business in Houston, Texas. Commonwealth is a wholly owned subsidiary of Commonwealth Projects, LLC, which is not a publicly traded company.

Commonwealth is a liquefied natural gas company that is developing a liquefied natural gas export facility to be located in Cameron Parish, Louisiana.

Respectfully submitted,


   */s/ John Longstreth*

## <u>TABLE OF CONTENTS</u>

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... ii

CORPORATE DISCLOSURE STATEMENT ...................................................... iii

TABLE OF CONTENTS........................................................................................iv

TABLE OF AUTHORITIES .................................................................................vi

GLOSSARY............................................................................................................x

STATEMENT OF THE ISSUES............................................................................1

STATUTES AND REGULATIONS......................................................................1

STATEMENT OF THE CASE...............................................................................1

SUMMARY OF ARGUMENT ..............................................................................1

ARGUMENT ..........................................................................................................3

I.      THE AUTHORIZATION ORDER'S CONSIDERATION OF THE
        PROJECT'S DIRECT GREENHOUSE GAS EMISSIONS FULLY
        COMPLIED WITH NEPA AND THE NGA..................................................3

        A.      NEPA DOES NOT REQUIRE FERC TO DETERMINE
                WHETHER THE PROJECT'S GREENHOUSE GAS
                EMISSIONS ARE SIGNIFICANT......................................................3

        B.      FERC WAS NOT OBLIGATED TO USE ITS DRAFT INTERIM
                GREENHOUSE GAS POLICY STATEMENT OR THE SOCIAL
                COST OF CARBON TO DETERMINE THE SIGNIFICANCE
                OF THE PROJECT'S GREENHOUSE GAS EMISSIONS ..............9

II.     FERC TOOK THE REQUISITE HARD LOOK AT AIR QUALITY
        IMPACT ON ENVIRONMENTAL JUSTICE COMMUNITIES...............14

        A.      PETITIONERS' ARGUMENTS REGARDING SIGNIFICANT
                IMPACT LEVELS ON ENVIRONMENTAL JUSTICE
                COMMUNITIES CANNOT BE HEARD ON APPEAL ..................14

B.   FERC TOOK A HARD LOOK AT CUMULATIVE IMPACTS ON AIR QUALITY................................................................16

C.   FERC'S AIR QUALITY ANALYSIS ADEQUATELY CONSIDERED ENVIRONMENTAL JUSTICE .............................24

III.  FERC APPROPRIATELY CONSIDERED AND REJECTED PETITIONERS' PROPOSED ALTERNATIVES.......................................27

A.   ON-SITE COMBINED-CYCLE POWER ........................................27

B.   ELIMINATION OF A SINGLE STORAGE TANK ........................30

C.   CARBON CAPTURE AND SEQUESTRATION ...........................33

IV.  FERC'S PUBLIC INTEREST FINDING WAS CONSISTENT WITH ITS CHARGE UNDER THE NATURAL GAS ACT .................................35

V.   IF THE COURT GRANTS ANY FORM OF RELIEF, IT SHOULD REMAND WITHOUT VACATUR.............................................................38

A.   THE AGENCY COULD CURE ON REMAND THE ISSUES IDENTIFIED BY PETITIONERS.......................................................38

B.   VACATUR WOULD BE DISRUPTIVE .........................................38

CONCLUSION ......................................................................................................40

CERTIFICATE OF COMPLIANCE..................................................................41

CERTIFICATE OF SERVICE .............................................................................42

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>:

*Alcoa Inc. v. FERC*,
 564 F.3d 1342 (D.C. Cir. 2009)……………………………………………..10

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
 988 F.2d 146 (D.C. Cir. 1993)……………………………………………38

*Appalachian Voices v. FERC*,
 2019 WL 847199…………………………………………………………..6

*Atl. Refining Co. v. Pub. Ser'v Comm'n*,
 360 U.S. 378 (1959)…………………………………………………...35

*Black Oak Energy, LLC v. FERC*,
 725 F.3d 230 (D.C. Cir. 2013)………………………………………....37

*Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*,
 449 F.2d 1109 (D.C. Cir. 1971)……………………………………..25

*Cmtys. Against Runway Expansion, Inc. v. FAA*,
 355 F.3d 678 (D.C. Cir. 2004)……………………………..………..21

*Coalition on Sensible Transp., Inc. v. Dole*,
 826 F.2d 60 (D.C. Cir. 1987)……………………………………………..12

*\*Ctr. for Biological Diversity v. FERC*,
 67 F.4th 1176 (D.C. Cir. 2023)……………………………………6, 8, 13, 31

*Del. Riverkeeper Network v. FERC*,
 45 F.4th 104 (D.C. Cir. 2022)……………………………………………6, 10

*Duncan's Point Lot Owners Ass'n v. FERC*,
 522 F.3d 371 (D.C. Cir. 2008)……………………………...….........12

*\*EarthReports, Inc. v. FERC*,
 828 F.3d 949 (D.C. Cir. 2016)……………………………………………6, 36

*Env't Def. Fund v. FERC*,
 2 F.4th 953 (D.C. Cir. 2021)……………………………………...…35

*Env't Health Tr. v. FCC*,
9 F.4th 893 (D.C. Cir. 2021)……………………………………………3, 4

*Food & Water Watch and Berkshire Envtl. Action Team*,
28 F.4th 277 (D.C. Cir. 2022)……………………………………………14

*Gulf South Pipeline Co., LP v. FERC*,
955 F.3d 1001 (D.C. Cir. 2020)…………………………………………..14

*Lemon v. Geren*,
514 F.3d 1312 (D.C. Cir. 2008)…………………………………………..31

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007)……………………………………………………...11

*Minisink Residents for Env't Pres. and Safety v. FERC*,
762 F.3d 97 (D.C. Cir. 2014)……………………………………………..33

*Mont. Wilderness Ass'n v. McAllister*,
666 F.3d 549 (9th Cir. 2011)…………………………………………..12, 13, 14

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)………………………………………………………..11

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)……………………………………...……8, 9, 30

*Sierra Club v. Costle*,
657 F.2d 298 (D.C. Cir. 1981)…………………………………….……4, 5

* *Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017)………………………………21, 24, 25, 26

*Sierra Club v. U.S. Dep't of Energy*,
867 F.3d 189 (D.C. Cir. 2017)……………………………………………36

*U.S. v. Whitmore*,
384 F.3d 836 (memorandum opinion) (D.C. Cir. 2004)………………………15

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
6 F.4th 1321 (D.C. Cir. 2021)…………………………………....3, 4, 38

vii

*W. Va. Pub. Servs. Comm'n v. U.S. Dep't of Energy*,
    681 F.2d 847 (D.C. Cir. 1982)……………………………………………....36


**Administrative Decisions:**

*Certification of New Interstate Natural Gas Facilities*,
    178 FERC ¶ 61,197 (2022)…………………………………………….....10

*Commonwealth LNG, LLC*, Order Addressing Arguments Raised on Rehearing,
    183 FERC ¶ 61,173 (2023) (JA090-152)….5, 8, 12, 14, 15, 20, 23, 27, 28, 30,
    32, 33, 34

*Commonwealth LNG*, *LLC*, Order Granting Authorization Under Section 3 of the
    Natural Gas Act,
    181 FERC ¶ 61,143 (2022) (JA001-89)…...3, 7, 8, 9, 11, 20, 26, 27, 30, 37, 38,
    39

*Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project
    Reviews*, 178 FERC 61,108 (2022)…………………………………….9, 10

*Corpus Christi Liquefaction Stage III, LLC*,
    181 FERC ¶ 61,033 (2022)………………………………………………15

*Gas Transmission Northwest LLC*,
    181 FERC ¶ 61,234 (2022)………………………………………………15

*Jordan Cove Energy Project*,
    171 FERC ¶ 61,136 (2022)……………………………………...……9

*PennEast Pipeline Co., LLC*,
    171 FERC ¶ 61,229 (2020)……………………………………..…15

*S. Shore Energy, LLC*,
    168 FERC ¶ 61,118 (2019)………………………………………………15

**Statutes:**

42 U.S.C. 7409 *et seq*…………………………………………………..17

42 U.S.C. 7475(a)(3)………………………………………………...17

**<u>Regulations</u>:**

40 C.F.R. § 1501.3(b)(1)…………………………………………………….27

40 C.F.R. § 1502.16(a)(1)……………………...……………...………3, 7

Executive Order 12898, Federal Actions to Address Environmental Justice in
 Minority Populations and Low-Income Populations,
 Federal Register Vol. 59 No. 32 (Feb. 16, 1994)………………………..26, 27


\* Authorities on which we chiefly rely are marked with an asterisk

# <u>GLOSSARY</u>

| | |
|---|---|
| Act or NGA | Natural Gas Act, 15 U.S.C. § 717 *et seq.* |
| Authorization Order | Refers to *Commonwealth LNG, LLC*, Order Granting Authorization Under Section 3 of the Natural Gas Act, 181 FERC ¶ 61,143 (2022) (JA001-89), *reh'g denied* 182 FERC ¶ 62,033 (2023) (JA501) |
| CCS | Carbon capture and sequestration |
| CEQ | Council on Environmental Quality |
| $CO_2$ | Carbon dioxide |
| Commission or FERC | Federal Energy Regulatory Commission |
| EIS | Environmental Impact Statement |
| LNG | Liquefied natural gas |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* |
| $NO_2$ | Nitrogen dioxide |
| Project | Commonwealth's natural gas liquefaction and export facility to be located in Cameron Parish, Louisiana |
| Rehearing Order | Refers to *Commonwealth LNG, LLC*, Order Addressing Arguments Raised on Rehearing, 183 FERC ¶ 61,173 (2023) (JA090-152) |

## STATEMENT OF THE ISSUES

Respondent-Intervenors adopt the statement of issues in the brief of the Federal Energy Regulatory Commission ("Commission" or "FERC").  *See* Brief for Respondent Federal Energy Regulatory Commission at 3, D.C. Cir., *Healthy Gulf v. Federal Energy Regulatory Commission*, Case Nos. 23-1069 & 23-1071, (filed Sept. 8, 2023) ("FERC Br.").

## STATUTES AND REGULATIONS

Relevant statutes and regulations are attached to the Brief for Respondent FERC.

## STATEMENT OF THE CASE

Respondent-Intervenors adopt FERC's statement of the case. *See* FERC Br. at 4-18.

## SUMMARY OF ARGUMENT

Petitioners fail to demonstrate that FERC's environmental review of the Project was insufficient under the National Environmental Policy Act ("NEPA") or that FERC's authorization of the construction and operation of the Project was inconsistent with Section 3 of the Natural Gas Act ("NGA").  Consistent with the requirements of NEPA and this Court's precedent, FERC appropriately considered and discussed the Project's direct greenhouse gas emissions and placed them into context in order to inform the public of the potential impacts of the Project's greenhouse gas emissions, and explained why it was unable to determine whether

1

these emissions would result in significant impacts.  Petitioners do not provide any support for their assertion that FERC was required to do more.

FERC also appropriately found that even though the National Ambient Air Quality Standard (NAAQS) for nitrogen dioxide ("$NO_2$") would be exceeded, operation of the Project would not result in a significant cumulative impact on air quality, as its direct $NO_2$ emissions would be far below the relevant significant impact level.  FERC's reliance on compliance with the significant impact level to find that the Project would not have significant cumulative air quality impacts on environmental justice communities is consistent with guidance and with this Court's precedent, and Petitioners fail to demonstrate otherwise.  Moreover, these arguments are not properly before this Court, because Petitioners failed to raise them with FERC prior to rehearing.

Petitioners' attempts to find fault with FERC's analysis of alternatives to the design of the Project amount to nothing more than flyspecking, and are incorrect in any event. FERC Br. at 19-20.  FERC relied on public information in the record to find that on balance, none of the alternatives proposed by Petitioners represented an environmentally preferable alternative.   Petitioners' disagreement with these findings does not demonstrate that FERC's analysis was insufficient under NEPA.

Finally, FERC's authorization of the Project was consistent with its charge under Section 3 of the NGA, as there had not been an "affirmative showing of

inconsistency with the public interest." Authorization Order P 15 (JA008-9). Contrary to Petitioners' assertion, the NGA did not require FERC to assess the benefits of the Project, as the NGA already presumes such benefits.

## ARGUMENT

I.  **THE AUTHORIZATION ORDER'S CONSIDERATION OF THE PROJECT'S DIRECT GREENHOUSE GAS EMISSIONS FULLY COMPLIED WITH NEPA AND THE NGA**

A.  **NEPA Does Not Require FERC To Determine Whether The Project's Greenhouse Gas Emissions Are Significant**

Petitioners contend that FERC's consideration of the Project's greenhouse gas emissions was arbitrary and capricious because FERC "refused" to assess the significance of these emissions. Petitioners argue that NEPA's "hard look" requirement (40 C.F.R. § 1502.16(a)(1)) requires FERC to disclose the significance of the Project's greenhouse gas emissions, and that this Court's opinion in *Vecinos para el Bienestar de la Comunidad Costera v. FERC,* 6 F.4th 1321, 1328 (D.C. Cir. 2021) ("*Vecinos*") requires FERC to use methods "generally accepted in the scientific community" to do so. Petitioners further assert that FERC's failure to disclose whether the Project's greenhouse gas emissions were significant made its authorization of the Project arbitrary and capricious, Joint Opening Brief of Petitioners Healthy Gulf, et al. at 28-29, D.C. Cir., *Healthy Gulf v. Federal Energy Regulatory Commission*, Case Nos. 23-1069 & 23-1071, (filed July 10, 2023) ("Pet. Br.") (citing *Env't. Health Tr. v. FCC*, 9 F.4th 893, 906 (D.C. Cir. 2021)), and that

this "conclusory statement" did not properly "identify the stepping stones" on the path to FERC's conclusion. *Id.* (citing *Sierra Club v. Costle*, 657 F.2d 298, 333 (D.C. Cir. 1981) ("*Costle*").

None of the opinions Petitioners cite support their contention that this Court's precedent requires FERC to make a finding as to the significance of a project's greenhouse gas emissions. Petitioners cite *Vecinos* for the proposition that FERC must "consider the Terminal's direct greenhouse gas emissions" and assess whether they would be significant. Pet. Br. at 27 (*citing Vecinos*, 6 F.4th at 1329), but that decision simply required FERC to consider whether a regulation required it to use the social cost of carbon as a method "generally accepted in the scientific community" to assess greenhouse gas emissions. *Vecinos,* 6 F.4th at 1329. Here, FERC used the social cost of carbon to provide an estimate of the Project's direct greenhouse gas emissions in terms of climate change impacts. The concerns this Court expressed in *Vecinos* are not present.

Petitioner's reliance on *Environmental Health Trust v. FCC* is wholly misplaced. There the FCC terminated a notice of inquiry by citing to "conclusory statements" by another agency. *Env't Health Tr. v. FCC,* 9 F.4th 893, 905-06. Here by contrast, FERC offered an extensive discussion of the Project's estimated greenhouse gas emissions from construction and operation, placed these emissions into local and national context, acknowledged that these emissions would contribute

4

to climate change impacts, provided the social costs of carbon emissions to further inform its analysis, and disclosed potential climate change impacts in the region. *See* FERC Br. at 44, 48-49. FERC's reasoned explanation that it was unable to determine whether the Project's emissions would result in significant climate change impacts in no way renders this analysis "conclusory." Pet. Br. at 29.

*Costle* also provides no support for Petitioners' argument, as the portions of *Costle* they cite dealt with whether the EPA properly supported its decision to utilize computer modeling in assessing New Source Performance Standards for sulfur dioxide, and did not discuss required findings as to greenhouse gases or anything else. *Costle*, 657 F.2d at 333. And as noted above, FERC's discussion here was anything but conclusory. *See* FERC Br. at 44, 48-49. FERC also explained why it was unable to determine based on its existing analysis whether or not the Project's greenhouse gas emissions were significant, as there are "no criteria to identify what monetary values are significant for NEPA purposes," and FERC could not identify any such criteria. Rehearing Order at P 40 (JA112-3). FERC further explained that it was unaware of any other scientifically acceptable method by which FERC could assess the significance of the Project's direct greenhouse gas emissions. *Id.*

Thus, contrary to Petitioners' argument, FERC did not "refuse[]" to assess the significance of the Project's greenhouse gas emissions. Pet. Br. at 28. Rather, FERC expressly considered the issue and explained why it was not able to do so

meaningfully. FERC Br. at 50-53.  This Court has repeatedly found this approach satisfactory. *See, e.g.*, *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1184 (D.C. Cir. 2023) (affirming the same determination); *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 111 (D.C. Cir. 2022) ("*Riverkeeper*") (noting that "[t]his court has upheld similar explanations as sufficient to justify the Commission's refusal to use the Social Cost of Carbon tool," citing *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) ("*EarthReports*")); *Appalachian Voices v. FERC*, 2019 WL 847199 (same). *EarthReports*, 828 F.3d at 956 (upholding the Commission's decision not to use the social cost of carbon tool due to a lack of standardized criteria or methodologies, among other things).

Petitioners make no attempt to distinguish these cases, including this Court's very recent opinion in *Center for Biological Diversity*, and they control this case. *See* FERC Br. at 19 (noting that the Petitioners cite to *Center for Biological Diversity* "in passing only twice").  Petitioners do not explain in these two passing references to *Center for Biological Diversity* how or why it or any of the other cases on which this Court relied in rejecting Petitioners' arguments in prior cases should be distinguished, or offer any other reason why it persists in presenting arguments that this Court has repeatedly rejected.[1]  Nor is any of this precedent undermined by

---

[1] It appears that Sierra Club's policy is to challenge virtually any decision authorizing LNG infrastructure or exports.  A party search performed on Pacer at the

FERC's consideration of a draft policy statement on the matter that is still nonfinal, as discussed more fully in the next section.

FERC's reasoned explanation of the quantity, context, and effects of the Project's direct greenhouse gas emissions, "substantively complie[s] with NEPA" in accordance with this Court's consistent precedent, and allowed it to act on Commonwealth's application. Authorization Order at P 76 (JA039-40). *See* FERC Br. at 44, 48-49. Outside of a lone reference to CEQ's NEPA regulations, which as discussed next is also fruitless, Petitioners do not even attempt to support their contrary contention that FERC must, in all instances, determine a distinct environmental impact to be significant or not in order to act on an application.

The CEQ NEPA regulations also provide no support for Petitioners' position. Section 1502.16(a)(1) of the regulations provides that the environmental consequences section of an EIS must include a discussion of "[t]he environmental impacts of the proposed action…and the significance of those impacts." The regulations do not require a federal agency to state definitively whether certain impacts will be significant - only that the agency discuss significance. Here, FERC did precisely this, discussing the greenhouse gas emissions at length and explaining

_____

time this brief was filed shows that in the past ten years it has filed or been party to nearly 50 petitions against FERC, over half of which have been filed since January 2021, and 15 petitions against DOE.

the current limitations on its ability to assess whether they would be significant. Final Environmental Impact Statement ("Final EIS") at 4-394-9 (JA378-83), Authorization Order at PP 75-76 (JA038-40), Rehearing Order at PP 39-41 (JA112-4). Petitioners cite to *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989) (*Robertson*), but that case does not require agencies to make a significance finding for all potential impacts. It states that an agency must discuss potential mitigation measures as a means to assess the severity of adverse effects. *Robertson*, 490 U.S. at 352. FERC did so here, discussing Commonwealth's proposed measures to mitigate emissions of methane from operation of the Project. Final EIS at 4-222-3 (JA339-40). Again, this Court has repeatedly deferred to FERC's explanations as to why it is unable to determine whether an individual project's greenhouse gas emissions will result in significant climate change impacts. *See, e.g. Ctr. for Biological Diversity*, 67 F.4th at 1184 (finding that FERC's explanation was "reasonable and mirrors analysis we have previously upheld").

Petitioners also contend that FERC's "refusal" to assess the significance of the Project's greenhouse gas emissions "impeded other parts" of FERC's analysis of the Project by "foreclos[ing] potential mitigation of adverse effects," and "depriv[ing] the public of informed, transparent decisionmaking…." Pet. Br. at 35-36. But as discussed above, NEPA does not require a significance finding for a project's impacts, and the Supreme Court has held that "NEPA does not impose a

substantive duty on agencies to mitigate adverse environmental effects…." *Robertson*, 490 U.S. at 333.  Petitioners cite a prior FERC order explaining that because FERC could not determine whether a project's emissions were significant, it was similarly unable to determine appropriate levels of mitigation. Pet. Br. at 36 (citing *Jordan Cove Energy Project*, 171 FERC ¶ 61,136 at P 254 (2022)).  But FERC had no duty to do so under precedent of the Supreme Court and this Court. *See* pp. 7-8, *supra*.  Petitioners are also incorrect to argue that by not formally declaring whether the Project's greenhouse gas emissions were "significant," FERC "denied the public" necessary information, as FERC provided substantial information regarding the Project's emissions.  Pet. Br. at 37; Authorization Order at P 76 (JA039-40).  All of this "guarantees that the relevant information [was] made available to the larger audience…."  *Robertson*, 490 U.S. at 349.

### B.  FERC Was Not Obligated To Use Its Draft Interim Greenhouse Gas Policy Statement Or The Social Cost Of Carbon To Determine The Significance Of The Project's Greenhouse Gas Emissions

Petitioners argue that FERC arbitrarily refused to utilize two particular methods of assessing greenhouse gas emissions that Petitioners insist could have "inform[ed] its analysis": FERC's draft policy statement "*Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project Reviews*" 178 FERC 61,108 (2022) ("Draft GHG Policy Statement"), and the social cost of carbon. Pet. Br. at 30-35.

Petitioners concede that "FERC, after it published the interim policy, decided not to apply it until it is finalized," but claim that FERC must apply it here because it "has not disagreed with any of the findings or statements therein."    Pet. Br. at 31. Petitioners do not explain how an agency can properly apply as a binding norm a policy that it has made clear is not "final guidance." *Certification of New Interstate Natural Gas Facilities*, 178 FERC ¶ 61,197 at P 2 (2022) ("Redesignation Order") ("The Commission will not apply the Updated Draft Policy Statement or the Draft GHG Policy Statement to pending applications or applications filed before the Commission issues any final guidance in these dockets.") *See also Riverkeeper,* 45 F.4th at 114-115 (noting and accepting that per the Redesignation Order, FERC would not be applying the Draft Certificate Policy Statement (or the Draft GHG Policy Statement) until after it issued final guidance on these issues.)

FERC cannot depart from its own precedent without "provid[ing] 'a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'" *Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009). Yet here Petitioners would have FERC "casually ignore" its Redesignation Order and apply it before it issues final agency guidance on this issue.

Application of the draft greenhouse gas guidance before the Commission has had an opportunity to consider and respond to comments on it and to finalize the guidance would itself be arbitrary and capricious.  Agency comment procedures are

prescribed and undertaken precisely because further consideration of arguments and data presented by the regulated community can lead the agency to change its mind. *See, e.g., Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174-175 (2007) (approving an agency decision to withdraw a proposed rule; notice of the proposed rule "meant that the Department was *considering* the matter; after that consideration the Department might choose to adopt the proposal or to withdraw it;" this was "reasonably foreseeable" and a "logical outgrowth" of the proposal and thus fully permissible) (emphasis in original). *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) ("[A]n agency action will be set aside as arbitrary and capricious if it is not the product of 'reasoned decisionmaking.'")

In the Authorization Order, FERC explained that it was not characterizing the Project's greenhouse gas emissions as significant or insignificant "because [FERC is] conducting a generic proceeding to determine whether and how the Commission will conduct significance determinations for GHG emissions going forward." Authorization Order at P 75 (JA038-9). On rehearing, however, pursuant to its authority under NGA Section 19(a), FERC clarified this discussion and explained that because there are "no criteria to identify what monetized values are significant

for NEPA purposes," FERC was unable to determine whether the Project's greenhouse gas emissions were significant. Rehearing Order at P 40, n.130 (JA113).

Petitioners further argue that difficulty in assessing significance or in applying the Social Cost of Carbon tool is not a sufficient basis for FERC to not use it to determine the significance of the Project's greenhouse gas emissions, as "'[t]he NEPA process involves an almost endless series of judgment calls'" Pet. Br. at 34 (quoting *Duncan's Point Lot Owners Ass'n v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008) (cleaned up)) ("*Duncan's Point*"), and that NEPA requires agencies "to make informed judgements 'the best it can with the data it has.'" *Id.* (quoting *Mont. Wilderness Ass'n v. McAllister*, 666 F.3d 549, 559 (9th Cir. 2011)) ("*Montana Wilderness*").

Petitioners' reliance on *Duncan's Point* misses the mark. That case considered whether FERC was required to prepare an EIS for construction of a discharge pipe and seawall related to a FERC-jurisdictional hydroelectric project in Missouri. *Duncan's Point*, 522 F.3d at 376. In upholding FERC's determination that these activities did not require an EIS, this Court explained that under NEPA "the line-drawing decisions necessitated" by the "almost endless series of judgement calls" required under the NEPA process "are vested in the agencies, not the courts." *Id.* (quoting *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987) (cleaned up). *Duncan's Point* supports deference to FERC's judgment that

it was unable to assess whether the Project's greenhouse gas emissions are significant, and provides no support for Petitioners' position. *See also Ctr. for Biological Diversity*, 67 F.4th at 1184 (deferring to a very similar FERC determination).

FERC's actions here were also fully consistent with *Montana Wilderness*. That case did not address whether and when an agency is required to determine the significance of a project's impacts, but rather whether the U.S. Forest Service adequately mitigated motorized recreation in a national forest adjacent to a wilderness study area. *Montana Wilderness*, 666 F.3d at 552-553. The Forest Service reasoned that it did not have accurate data on the matter when the wilderness area was created in 1977, and thus could not reduce contemporary motorized recreation to match the 1977 level. *Id.* at 558-559. The court held that the Forest Service must simply "do the best it can with the data it has," and that is what FERC has done here. *Id.* at 559. In the absence of criteria to determine what monetized values of greenhouse gas impacts are significant under NEPA, or any other scientifically accepted method to determine the significance of a project's greenhouse gas emissions, FERC explained that while it can provide an estimate of the social costs of the Project's greenhouse gas emissions, it cannot assess whether these emissions are significant. It thus discussed the impacts and put them into

13

context with the information it had.  This approach is fully consistent with the court's

charge in *Montana Wilderness.*

## II.  FERC TOOK THE REQUISITE HARD LOOK AT AIR QUALITY IMPACT ON ENVIRONMENTAL JUSTICE COMMUNITIES

### A.  <u>Petitioners' Arguments Regarding Significant Impact Levels On Environmental Justice Communities Cannot Be Heard On Appeal</u>

Petitioners contend that FERC erred in rejecting their argument that air

pollution impacts may still be significant even if the significant impact level ("SIL")

is not exceeded.  Pet. Br. at 48-49.  FERC responded to this argument, Rehearing

Order at P 51 (JA120-1), but Petitioners raised these issues for the first time on

rehearing.  Petitioners do not dispute that they raised this argument for the first time

on rehearing, but contend that this Court's opinion in *Gulf South Pipeline Co., LP v.*

*FERC*, 955 F.3d 1001, 1012-1013, n.2 (D.C. Cir. 2020) allows them to do so if they

"adequately apprised" FERC of their position so that FERC could respond to it. Pet.

Br. at 51-52.

Petitioners' argument is inconsistent with the plain language of the Natural

Gas Act, which states that a party cannot raise an issue on appeal unless it has first

sought rehearing as to the issue.  15 U.S.C. § 717r(a).  An issue cannot be "re"-heard

by an agency unless it was offered to the agency for consideration in the first place.

The rehearing requirement is party-specific. *See, e.g., Food & Water Watch and*

*Berkshire Envtl. Action Team*, 28 F.4th 277, 284 (D.C. Cir. 2022) ("Filing a joint

petition for review does not permit an end-run around the party-specific nature of the exhaustion requirement.")  This Court also recognizes the general rule that "a party may not raise an issue for the first time on rehearing." *U.S. v. Whitmore*, 384 F.3d 836 (memorandum opinion) (D.C. Cir. 2004).

Petitioners' argument is also inconsistent with longstanding FERC precedent. FERC has consistently held that it "looks with disfavor on parties raising issues for the first time on rehearing that could have been raised earlier, in part because other parties are not permitted to respond to requests for rehearing." Rehearing Order at P 51 n.171 (JA120-1); *see also Corpus Christi Liquefaction Stage III, LLC*, 181 FERC ¶ 61,033 at P 13 (2022), *PennEast Pipeline Co., LLC*, 171 FERC ¶ 61,229 at P 12 (2020).  FERC has further explained that allowing parties to a proceeding to raise arguments for the first time on rehearing "is disruptive to the administrative process because it has the effect of moving the target for parties seeking a final administrative decision." *Gas Transmission Northwest LLC*, 181 FERC ¶ 61,234 at P 12 (2022) (*citing S. Shore Energy, LLC*, 168 FERC ¶ 61,118 at P 12 (2019).

As experienced and repeat litigants before FERC, Petitioners were or should have been aware of FERC's rule against raising issues for the first time on rehearing. They offer no good cause for their violation of the rule.  To permit this course of conduct would turn sound administrative procedure on its head, obviating the need for FERC to fully develop an administrative record upon which rehearing issues

should arise from, and allow parties to raise objections to applications to construct needed energy infrastructure while preventing the applicant from responding to such objections at all.  This Court should not countenance hiding the ball in this manner.

Regardless, however, as discussed next in this brief and in FERC's brief, FERC appropriately found that cumulative impacts on air quality, including in environmental justice communities, would not be significant where the Project's air emissions do not exceed significant impact levels at the time and place of an exceedance of the NAAQS.

## B.    FERC Took A Hard Look At Cumulative Impacts On Air Quality

Petitioners contend that FERC failed to take the requisite "hard look" at cumulative air impacts. at 40-46.  Petitioners insist that FERC inappropriately relied on significant impact levels to determine that the Project's cumulative nitrogen dioxide ($NO_2$) emissions would not result in significant cumulative impacts. *Id.* at 42-46.  Petitioner advances three arguments to support its challenge of FERC's conclusion:  (1) FERC inappropriately relied on significant impact levels to evaluate cumulative air quality impacts; (2) EPA guidance required FERC to have done more than it did; and (3) FERC arbitrarily relied on the EPA's 1-hour $NO_2$ NAAQS to find that there would be no cumulative air quality impacts.  None of Petitioners' arguments has merit.

As to the first point, significant impact levels are a reasonable analytical methodology to evaluate cumulative impacts that is entitled to deference, and FERC thoroughly explained its modeling, air quality evaluation process, and its conclusion regarding cumulative impacts on air quality.  Section 109 of the Clean Air Act requires EPA to establish, review and revise as appropriate NAAQS that ensure adequate health and environmental protection. 42 U.S.C. 7409 *et seq*.  Once NAAQS have been set, EPA designates areas either meeting (attainment) or not meeting (non-attainment) NAAQS.  For emissions sources located in attainment areas, such as the Project, the Clean Air Act's Prevention of Significant Deterioration program requires preconstruction review. Final EIS at 4-207 (JA324).  An applicant must demonstrate "that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any" NAAQS or [Prevention of Significant Deterioration] increment. 42 U.S.C. 7475(a)(3).  A Prevention of Significant Deterioration increment is the amount that pollution in an area is allowed to increase without deteriorating the air quality beyond the level set by the NAAQS. Final EIS at 4-231 (JA348).

Under this review, significant impact levels are utilized to assess whether the NAAQS will be met with issuance of a permit.[2]  EPA uses significant impact levels

---

[2] *Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program*, at 1 (April 17, 2018)("*Ozone and Fine Particles SILs Guidance*").

17

"to identify the degree of air quality impact that 'causes, or contributes to' a violation of a NAAQS" and to serve as a "compliance demonstration tool" that a proposed source will not have a significant or meaningful impact on air quality.[3]  Assessment of whether the NAAQS will be met involves an initial "significance analysis" and, if warranted, a "full impact analysis." Generally, the "significance analysis" considers emissions only associated with the Project to determine if the emissions could be "significant." Final EIS at 4-225 (JA342).  Only if the "significance analysis" reveals an exceedance of the significant impact level, a "full impact analysis" is performed, which considers emissions from existing sources in addition to the Project. *Id.*

If the "full impact analysis" identifies a potential NAAQS exceedance, the applicant must determine the proposed project's contribution to the potential exceedance. *Id.*; *see also* Louisiana Air Quality Modeling Procedures Guidance at 2-5 (Aug., 2006). This "source contribution analysis" compares the proposed project's contribution to the potential NAAQS exceedance to the significant impact level. Final EIS at 4-231 (JA348). If the maximum contribution from the proposed project is less than the SIL, it is deemed not to cause or contribute to the NAAQS

---

[3] *Ozone and Fine Particles SILs Guidance* at 5 (noting that the SIL values "have helped to reduce the burden on permitting authorities and permit applicants to conduct often time-consuming and resource-intensive air dispersion modeling where such modeling was unnecessary to demonstrate that a permit applicant meets the requirements of section 165(a)(3)….").

exceedance. *Id.* at 4-225-6 (JA342-3); *see also* Louisiana Air Quality Modeling Procedures Guidance at p. 2-6.

Compliance with the Clean Air Act's Prevention of Significant Deterioration program thus assures that a project that satisfies the relevant NAAQS will not significantly contribute to an exceedance of that standard. The project at issue here (inclusive of the proposed terminal and pipeline and associated carrier transit), as well as the proposed alternatives, are all in attainment areas, meaning they currently satisfy the relevant NAAQS. Final EIS at 3-40-5 (JA294-9), 4-204 (JA321). Although states can create stricter standards, the Louisiana Department of Environmental Quality has not done so. *Id.* at 4-202 (JA319).

In order to demonstrate compliance with the NAAQS and criteria pollutants subject to review under EPA's Prevention of Significant Deterioration program, Commonwealth conducted air dispersion modeling using the EPA-recommended "AERMOD" air quality model. *Id.* at 4-225 (JA342). The results of this "significance analysis" required a "full impact analysis" to assess compliance with NAAQS and Prevention of Significant Deterioration increments. *Id.* at 4-225-8 (JA342-5).

The "full impact analysis" included modeling the Project's pollutant sources together with background sources from off-site inventory within the area of impact plus 15 km and all major sources within the area of impact plus 20 km, which showed

an exceedance of the NAAQS for a single pollutant: 1-hour $NO_2$. *Id.* at 4-228-9 (JA345-6), 4-231 (JA348). In compliance with LDEQ protocols, Commonwealth then conducted a "source contribution analysis" to determine whether the Project would contribute significantly to the exceedance of the 1-hour $NO_2$ NAAQS. *Id.* at 4-390 (JA374).

As discussed in the Final EIS, this "source contribution analysis" showed that any portions of the NAAQS exceedance attributable to the Project ($0.00043$ ug/m$^3$) were a vanishingly small fraction of the significant impact level ($7.5$ ug/m$^3$)). *Id.* at 4-231 (JA348). Even when taking into account mobile emissions sources (*i.e.* from LNG vessels and tugs) the Project's emissions ($0.0055$ ug/m$^3$) were still well below the significant impact level, and beyond LDEQ's requirements for air modeling. Final EIS at 4-226 (JA343), 4-230-1 (JA347-8). The Final EIS further explained that "the [NAAQS] exceedances would still be predicted in the absence of the Project." *Id.* at 4-392 (JA376).

Based on this analysis, the Final EIS appropriately found that operation of the Project (inclusive of mobile sources) could contribute to a potential exceedance of the 1-hour NAAQS for $NO_2$, but that the Project's contribution at each monitoring location in exceedance of the 1-hour NAAQS for $NO_2$ would be less than the significant impact level for the location. *Id.* Accordingly, the Final EIS concluded the Project would not cause or contribute to a potential exceedance of the NAAQS

for NO$_2$ and would not result in significant impacts on air quality in the region. *Id.* at 4-226 (JA343), 4-392 (JA376).  FERC's Authorization Order and Rehearing Order agreed with this analysis. Authorization Order at P 63 (JA032-3); Rehearing Order at P 49 (JA119).

FERC's reliance on significant impact levels to determine whether the Project's emissions would result in significant cumulative air quality impacts is consistent with this Court's precedent.  In *Sierra Club v. FERC*, 867 F.3d 1357, 1371, n.7 (D.C. Cir. 2017) ("*Sabal Trail*") this Court found "FERC appropriately relied on EPA's [NAAQS] as a standard of comparison for air-quality impacts," to determine that "project cumulative levels of [air pollution]…would remain below harmful thresholds."  This Court noted that "[b]y presenting the project's expected emissions levels and the NAAQS standards side-by-side, the EIS enabled decision-makers and the public to meaningfully evaluate the project's air-pollution effects by reference to a generally accepted standard." *Id.*  This Court has also held that "[FERC's] choice among reasonable analytical methodologies is entitled to deference." *Id.* at 1368 (*citing Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004).  FERC took the requisite hard look at the Project's cumulative impacts on air quality in accordance with this Court's precedent.

As to the second point, Petitioners rely on a 35-year-old memorandum from another agency for the proposition that "where modeling indicates that a violation

will occur but that a proposed source's contribution will be small, the project may be approved but the violation must be addressed in other ways." Pet. Br. at 43 n.10, citing *Memorandum from Gerald Emison, EPA Office Air Quality, to Thomas Maslany, EPA Air Mgmt. Div., Subject: "Air Quality Analysis for Prevention of Significant Deterioration" at 2* (July 5, 1988) ("*Emison Memorandum*").  Petitioners also cite 75 Fed. Reg. 64864, 64892 of the Preamble to *Prevention of Significant Deterioration for Particulate Matter Less than 2.5 Micrometers (PM$_{2.5}$)— Increments, SILs, and Significant Monitoring Concentration* (Oct. 20, 2010) *("PM 2.5 SIL Rule Preamble")* for the proposition that "where a project's impacts fall below the Significant Impact Level, the permitting agency can still find that a project causes or contributes to a NAAQS violation based on other factors." Pet. Br. at 12, citing *PM 2.5 SIL Rule Preamble* 75 Fed. Reg. 64864, at 64892.

Petitioners mischaracterize both the language and purpose of the Emison Memorandum and the PM 2.5 SIL Rule Preamble.  The *Emison Memorandum* was the EPA Office of Air Quality Planning and Standard's attempt to clarify to the Air Management Division how to interpret dispersion modeling results for the PSD permitting process, and therefore imposed no additional duties beyond what is already required by the Clean Air Act.  Likewise, the PM 2.5 SIL Rule Preamble states "notwithstanding the existence of a [significant impact level], permitting authorities should determine when it may be appropriate to conclude that even a *de*

*minimis* impact will 'cause or contribute' to an air quality problem and to seek remedial action from the proposed new source or modification." 75 FR 64892.  Thus, the PM 2.5 SIL Rule Preamble encourages permitting authorities to determine whether remedial measures should be imposed where the agency determines a *de minimis* impact will still cause or contribute to an air quality problem.

Here, however, FERC found the Project will not cause or contribute to a potential NAAQS exceedance due to the small scale of the Project's emissions and its compliance with the applicable significant impact level, so that suggestion does not apply here. Final EIS at 4-231 (JA348). Moreover, both the *PM 2.5 SIL Rule Preamble* and the *Emison Memorandum* apply only to the permitting process, and FERC is not the permitting authority under the Clean Air Act.  As FERC noted, this means that the "cited EPA guidance is inapposite for guiding the Commission's analysis under NEPA." Rehearing Order at P 56 (JA124).  The Louisiana DEQ, not FERC, is the proper agency to ultimately determine if additional mitigation measures or remedial actions are needed, and the project is in compliance with Louisiana DEQ requirements. *Id.* at P 55 (JA123-4).

Finally, Petitioners contend that EPA, in implementing its *Guidance Concerning the Implementation of the 1-hour $NO_2$ NAAQS for the Prevention of Significant Deterioration Program* (June 29, 2010) ("Guidance"), "did not engage in any comparable analysis or expert judgment [relative to the review EPA did in

23

adopting the 1-hour NO2 NAAQS] in proposing the interim one-hour nitrogen oxide Significant Impact Level" and therefore the Guidance does not reflect "considered judgment about the point at which cumulative pollution levels becomes unacceptably harmful." Pet. Br. at -50.

This Court is not the suitable forum for Petitioners to collaterally attack EPA's Guidance. As it stands, the Guidance and its supplement (Additional Clarification Regarding Application of Appendix W Modeling Guidance for the 1-hour $NO_2$ AAQS, dated Mar. 1, 2011, and the Clarification on Use of AERMOD Dispersion Modeling Demonstrating Compliance with $NO_2$ NAAQS, dated Sept. 30, 2014) remain valid guidance tools for demonstrating compliance with the 1-hour $NO_2$ NAAQS, including in the "full impact analysis," using the current significant impact levels. To the extent that in conducting its air quality analysis FERC relied on these guidance tools (including the supplement that Petitioners do not mention), it is entitled to deference. *Sabal Trail*, 867 F.3d at 1368.

## C.    FERC's Air Quality Analysis Adequately Considered Environmental Justice

Petitioners aver that FERC arbitrarily relied on significant impact levels to assess whether the Project's air emissions would have significant cumulative impacts on environmental justice communities, as "compliance with Significant Impact Levels does not satisfy NEPA's distinct inquiry" as to environmental justice communities. Pet. Br. 46. Petitioners contend that FERC cannot conclude that

impacts on environmental justice communities would be less than significant because the Project would not contribute to an exceedance of the one-hour $NO_2$ NAAQS, or exceed the significant impact level, as "NAAQS are neither a floor nor a ceiling for health impacts." Pet. Br. at 47. Nor, Petitioners allege, is compliance with the significant impact level for one-hour $NO_2$ sufficient for FERC to find that there would not be significant cumulative air quality impact on environmental justice communities, as "compliance with other laws may not fully ameliorate a project's environmental harms." Pet. Br. at 48-49 (*citing Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1123 (D.C. Cir. 1971).

FERC was not required to "select the course of action that best serves environmental justice, only to take a 'hard look' at environmental justice issues,'" which is exactly what FERC did. *Sabal Trail,* 867 F.3d at 1368. The Final EIS acknowledged that a majority of the potential $NO_2$ one-hour NAAQS exceedances within the modeled area identified from the cumulative modeling (i.e. "full impact analysis") would be within environmental justice communities. Final EIS at 4-199 (JA317). However, the Final EIS determined that because Commonwealth's contribution to all exceedances is estimated to be less than the significant impact level at all exceedance locations (as FERC noted "[i]n fact, the exceedances would still be predicted in the absence of the Project (i.e., the existing background emissions sources from LDEQ's Emissions and Inventory Reporting Center are

25

driving the NAAQS exceedances)),” the Project would not cause or significantly contribute to a potential exceedance of the NAAQS and would not result in significant impacts on air quality in the region.  Final EIS at 4-231 (JA348). Authorization Order at P 63 (JA032-3).

The Final EIS further acknowledged that, although the Project would not cause an exceedance of NAAQS, these standards are designated to protect sensitive populations, and that “attainment alone may not ensure there is no localized harm to such populations due to project emissions of volatile organic compounds, hazardous air pollutants, as well as issues such as the presence of non-project related pollution sources, local health risk factors, disease prevalence, and access (or lack thereof) to adequate care.” *Id.*  FERC thus went on to analyze this further and found that although “[e]nvironmental justice communities in the study area would experience cumulative impacts on air quality[,] [] these impacts would be less than significant.” *Id.*  FERC’s Final EIS demonstrated “reasoned decision-making” because its analysis of air quality impacts to environmental justice communities was “reasonable and adequately explained.” *Sabal Trail,* 867 F.3d at 1368 (internal citations omitted).

FERC’s assessment of cumulative air quality impacts on environmental justice communities was consistent with both NEPA and Executive Order 12898. Pursuant to Executive Order 12898, FERC employed the “50%” methodology, the

"meaningfully greater analysis" methodology, the "low-income threshold criteria" methodology, and the EJScreen methodology recommended in *Promising Practices* for identifying environmental justice communities as required by 40 C.F.R. § 1501.3(b)(1).  Authorization Order at PP 46-51 (JA021-4), Rehearing Order at P 58 (JA125-6), Final EIS at 4-187-8 (JA308-9).    After properly identifying environmental justice communities, FERC thoughtfully engaged these communities and responded to comments received.  *See* Final EIS at 4-188-90 (JA309-11) ((detailing all efforts made to provide meaningful engagement and public involvement and comment, citing *CEQA Guidance* and *Promising Practices*).  *See also* Authorization Order at 21 n.81-2 (JA021-2) (noting the opportunities for public involvement during FERC's prefiling and environmental review process); Final EIS at Appendix M (JA420-54) (responding to comments received on the draft EIS). Finally, FERC evaluated the Project's impacts and based on that evaluation explained that the Project would not result in significant cumulative air quality impacts on environmental justice communities.  This fulfilled FERC's duties under NEPA and Executive Order 12898.

## III.  FERC APPROPRIATELY CONSIDERED AND REJECTED PETITIONERS' PROPOSED ALTERNATIVES

### A.  <u>On-Site Combined-Cycle Power</u>

Petitioners assert that FERC should have modified the Project's design to include a combined-cycle power plant, rather than the single-cycle combustion

turbine power plant proposed by Commonwealth in its design of the Project. Petitioners contend that the potential for a combined-cycle power plant to "reduce air pollution by 10%" is an environmentally preferable alternative to the use of simple-cycle turbines, which "FERC arbitrarily rejected [] based on speculation that it would require an unspecified increase in the Terminal's footprint." Pet. Br. at 55. In support, Petitioners insist that "[n]othing in the record supports FERC's claim that a combined cycle alternative would require a bigger footprint." *Id.* at 57.

Petitioners are simply wrong. The record demonstrates that a combined-cycle power plant would essentially double the Project's footprint, with an attendant increase in adverse environmental impacts on wetlands and endangered species, among other resource areas. June 24, 2022 Response to Environmental Information Request, at p.10, ("June 24 Response") (JA249); Rehearing Order at PP 22-26 (JA100-4). To summarize, in an August 3, 2021 protest of Commonwealth's Project, a group of project opponents including parties who are petitioners here (Healthy Gulf, Center for Biological Diversity, Louisiana Bucket Brigade, Sierra Club, and Turtle Island Restoration Network) raised the precise issue of whether as an alternative to utilizing simple-cycle gas turbines to produce power for the Project, Commonwealth should utilize combined-cycle turbines. Protest of Center for Biological Diversity, et al., FERC Docket No. CP19-502-001 (Aug. 3, 2021) ("August 3 Protest"), (JA166-77). In direct response to these comments, FERC Staff

28

issued information requests asking Commonwealth to respond. *See* Environmental Information Request, Docket No. CP19-502-000 et al., (filed Sept. 15, 2021) ("September 15 EIR") (JA178-83).  Commonwealth explained in response that it fully evaluated the possibility of utilizing a 500 MW combined-cycle power plant for the entirety of the Project's electricity needs, but ultimately found that a such a combined cycle power plant "would require an additional 100 acres" which would "essentially doubl[e]" the Project's 105.7 acre permanent footprint. September 30, 2021 Response to Environmental Information Request, at p. 41, ("September 30 Response")  (JA189).

FERC further explained that even if combined-cycle turbines were utilized for the Project's 120 MW auxiliary power needs (that is, for facilities other than the refrigeration compressors), the combined-cycle turbines would still require land uses above Commonwealth's proposed facility design incorporating simple-cycle gas turbines "to accommodate the waste heat recovery equipment, steam turbine, air-cooled condenser, and water treatment facilities."   Final EIS at 3-48 (JA302). Moreover, Commonwealth explained that upon further analysis "the conclusion was reached that converting natural gas to electricity, then back to mechanical power [as is required for a combined cycle power plant]…is not the most efficient solution." June 24 Response, at Response to Information Request No. 7, (JA249).  The losses associated with the combined cycle conversion process "eliminate any benefit" of a

combined-cycle turbine for the Project, when compared with Commonwealth's proposed simple-cycle gas turbine drives and heat recovery. *Id.* FERC, after balancing the substantial increase in Project footprint that would occur as a result of utilizing combined-cycle generation units, and the potentially negligible efficiency gains, appropriately found that the use of combined-cycle generation "would not provide a significant environmental advantage over Commonwealth's proposed design." Rehearing Order at P 26 (JA103-4). Such "balancing" is well within FERC's discretion. FERC Br. at 33-34. As FERC further explained, NEPA does not require that in all instances an agency select what is suggested to be the least environmentally damaging alternative - only that the agency adequately discusses the alternatives and the agency's reason for rejecting it. FERC Br. at 6 (citing *Robertson*, 490 U.S. at 350).

### B.    Elimination of a Single Storage Tank

Largely repeating their arguments regarding FERC's rejection of combined-cycle power at the Facility, Petitioners assert that "FERC similarly failed to justify its conclusion" that eliminating a single storage tank at the Project would result in an "environmentally beneficial" alternative. Pet. Br. at 60. Petitioners allege FERC should have accepted an alternative by which Commonwealth would construct five (5), 50,000 cubic meter storage tanks (as opposed to the six (6), 50,000 cubic meter storage tanks proposed by Commonwealth and approved by FERC in the

Authorization Order), which Petitioners contend would allow the footprint of the Project to be reduced accordingly. *Id.* at 60-61.  Petitioners assert that FERC failed to explain how the increased operational flexibility and reduced air emissions enabled by the construction of the sixth storage tank outweigh the benefits of the reduced Project footprint that Petitioners allege would result from the elimination of the sixth storage tank.

FERC considered this issue multiple times during its evaluation of the Project, and both Commonwealth and FERC have responded to these concerns in full. Petitioners simply disagree with FERC's conclusion, which provides no basis to overturn it.  *See, e.g., Ctr. for Biological Diversity*, 67 F.4th at 1186 ("[t]o the extent [a petitioner] simply disagrees with FERC's decision … NEPA does not compel any particular policy decision by the agency.  Rather, NEPA ensures only that an agency has assessed the environmental impacts of proposed actions before authorization.") (citing *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008).

The record amply reflects FERC's consideration of this issue.  Commenters expressed opposition in an August 2021 protest to Commonwealth's proposal to construct six (6), 50,000 cubic meter storage tanks as part of its Project, alleging that Commonwealth did not show "why an increase in overall storage capacity is warranted" and that FERC should instead permit Commonwealth to construct five (5) 50,000 cubic meter storage tanks, as it would allow Commonwealth "to reduce

the overall facility footprint and scale of construction impacts." August 3 Protest at 4-5, (JA169-70).  FERC Staff asked Commonwealth to respond, addressing in particular "whether Commonwealth could reduce the footprint of the Terminal site by reducing to five the number of 50,000 cubic meter ($m^3$) LNG storage tanks." September 30 Response at p. 36 (JA184). Commonwealth explained in response that based on publicly available site plans provided to FERC "[t]he terminal footprint would not be reduced by eliminating one of the six storage tanks." *Id.* at p. 37, (JA185).  There would thus be no benefit in terms of reduced acreage from eliminating a sixth storage tank. *Id.*

Commonwealth went on to explain in detail that the additional storage capacity provided by a sixth tank would allow for increased "operating flexibility during adverse weather events." *Id* at p. 36 (JA184).  During such events, when the Calcasieu Ship Channel is closed and Commonwealth would not be able to load LNG onto ships, the additional storage capacity offered by a sixth tank would allow Commonwealth to continue operating its facility, and avoid the need to shutdown/restart the facility, or potentially vent off or flare gas. *Id.*  FERC's Rehearing Order accepted Commonwealth's explanation, which was not contradicted in the record, that there would be no reduction in the facility's footprint by eliminating the sixth storage tank and that tank would provide operational

flexibility, and thus was "not persuaded" by Petitioners' argument that it would be beneficial to eliminate the sixth storage tank. Rehearing Order at P 31 (JA106).

Petitioners allege that FERC provided "no detail" to justify this decision, including how often the Project would have to shut down with a five-tank alternative, or the precise air emissions of these shutdowns and start ups. Pet. Br. at 62-63. This is simply an improper attempt to "flyspeck an agency's environmental analysis." *See Minisink Residents for Env't Pres. and Safety v. FERC*, 762 F.3d 97, 112 (D.C. Cir. 2014) (cleaned up). NEPA requires agencies look at a "reasonable range of alternatives" to the proposed action. 42 U.S.C. § 7332(C)(iii). NEPA does not, however, permit project opponents to fundamentally redesign, or otherwise micromanage projects that are subject to NEPA review. FERC's explanation that there would be no environmental benefit to eliminating the sixth storage tank, and that it would in fact offer operational flexibility that could reduce environmental impacts, was fully sufficient. Rehearing Order at P 31 (JA106).

### C.    <u>Carbon Capture and Sequestration</u>

Finally, Petitioners contend that FERC failed to justify its rejection of an alternative to require the use of carbon capture and sequestration ("CCS") systems at the Project. Pet. Br. at 64-67. Petitioners central argument is that FERC failed to rigorously evaluate whether Commonwealth could utilize the same sequestration infrastructure proposed by the CP2 LNG Project, a proposed, unapproved LNG

export terminal that would be located approximately 1.5 miles from Commonwealth's facility, and intends to sequester captured $CO_2$ at a sequestration site approximately three miles off the coast of Louisiana. *Id.*

FERC, however, did consider whether Commonwealth could use this infrastructure. The Final EIS explains that CP2's parent company described "the pipeline alignment, platform location, and well location" as "in the siting stage of project development," and that without this information from a separate project developer, FERC was "unable to evaluate" the use of CP2's sequestration site for $CO_2$ captured from Commonwealth's Project. Final EIS at 4-399 (JA383). FERC Staff's July 28, 2023 Final EIS for the CP2 LNG Project explains that this sequestration infrastructure (including "pipeline alignment, platform location, and well location") remains "in the siting stage of project development," nearly a year after the Final EIS for this Project was issued. FERC Br. at 41-42; *see also* CP2 LNG and CP Express Project, Final Envtl. Impact Statement at 2-9, FERC Dkt. Nos. CP22-21 and CP22-22 (July 2023) (JA510). Petitioners do not explain how FERC could have determined CP2's sequestration infrastructure to be suitable for use by Commonwealth when the location of the pipeline or sequestration site for CP2's proposed CCS project is still entirely unknown.

34

## IV. FERC'S PUBLIC INTEREST FINDING WAS CONSISTENT WITH ITS CHARGE UNDER THE NATURAL GAS ACT

Petitioners offer two challenges to FERC's finding that the construction and operation of the Project was not inconsistent with the public interest. Pet. Br. at 67-68. First, Petitioners assert that because FERC's environmental review of the Project was deficient under NEPA, FERC "lacked a rational basis" for the finding. *Id.* at 68. Second, Petitioners contend that FERC "failed to reasonably explain its public interest finding." *Id.* (citing *Env't. Def. Fund v. FERC*, 2 F.4th 953, 975 (D.C. Cir. 2021).

Petitioners' assertion that FERC's public interest finding was undermined by perceived NEPA deficiencies is of no weight, as FERC's environmental review of the Project was in full compliance with NEPA, for the reasons stated in FERC's orders, and set out in this brief and FERC's brief.

Petitioners also contend that in authorizing the construction and operation of the Project FERC "leaned heavily" on the presumption in NGA Section 3 that the construction and operation of LNG terminals is in the public interest, but that in so doing, "FERC failed to justify its conclusion that the presumption 'was not overcome'" principally by failing to balance the Project's "presumed public interest benefits" against its adverse environmental impacts. Pet. Br. at 70-71 (citing *Atl. Refining Co. v. Pub. Ser'v Comm'n*, 360 U.S. 378, 391 (1959) ("*Atlantic Refining*").

35

Petitioners' argument confuses Sections 3 and 7 of the NGA. Petitioners cite *Atlantic Refining*, Pet. Br. at 70 (*citing Atlantic Refining*, 360 U.S. at 391), but that case deals with FERC's authority under Section 7 of the NGA, which requires FERC to make an affirmative finding that a FERC-jurisdictional pipeline will be required by the public convenience and necessity, after weighing the benefits of the project against its adverse impacts. It is well established that unlike NGA Section 7, NGA Section 3 "presumes" the public benefits of LNG export terminals, and therefore NGA Section 3 sets forth a presumption favoring the approval of an application under NGA Section 3, which may only be overcome with an affirmative showing of inconsistency with the public interest. *See* FERC Br. at 24-25. *See also EarthReports*, 828 F.3d at 953 (quoting *W. Va. Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982)); *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 203 (D.C. Cir. 2017) ("*Freeport*").

Accordingly, FERC need not opine on the "purported benefits" of Commonwealth's Project as Congress has already done so. FERC's responsibility under NGA Section 3 is to assess the record, including its NEPA review, and determine whether there has been an "affirmative showing" that the Project is in fact inconsistent with the public interest. *Freeport*, 867 F.3d at 189. FERC performed this analysis and approved the application, after finding that it had not been shown that the construction and operation of the Project was inconsistent with the public

interest. Authorization Order at PP 18, 85 (JA010, 043).  The NGA requires nothing more.

Citing the concurrences of two Commissioners who voted to approve the project, Petitioners allege that FERC's public interest finding violated the NGA as it "failed 'to provide a clear framework for the Commission to make its public interest determination.'" Pet. Br. at 68 (citing Authorization Order, Clements Concurrence at P 5 (JA087), Glick Concurrence at P 5 (JA073-4)).  This argument mischaracterizes the concurrences on which it purports to rely, and takes them out of context.  The concurrences expressed misgivings about the guidance given by the NGA, not the Authorization Order.  For example then-Chairman Glick suggested that "section 3 of the NGA does not provide a sufficient framework for consideration of the adverse impacts associated with a proposed LNG facility." Authorization Order, Glick Concurrence at P 2 (JA072). Commissioner Clements echoed these concerns, requesting "Congress to provide a clear framework" under NGA Section 3.  Authorization Order, Clements Concurrence at P 5 (JA087).

Whatever the merits of these thoughts, this Court has no more authority to rewrite NGA Section 3 than the Commissioners did.  The Authorization Order is fully consistent with NGA Section 3 as written.

37

## V.    IF THE COURT GRANTS ANY FORM OF RELIEF, IT SHOULD REMAND WITHOUT VACATUR

### A.    The Agency Could Cure on Remand The Issues Identified By Petitioners

Petitioners' claims lack merit, and this Court should not grant any relief. But if the Court finds merit in any claims, the relief sought—vacatur—is inappropriate. If it were to prove necessary to consider the merits of any of Petitioners' arguments on remand, which Commonwealth does not believe it should be for the multiple reasons it has stated, it is certainly "plausible that FERC can redress its failure of explanation on remand while reaching the same result." *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013).  Petitioners do not argue that any of FERC's actions are beyond its authority.  Rather, Petitioners assert that FERC based its conclusions in the Authorization Order on insufficient evidence or analysis. FERC thus could, and Commonwealth believes should, reaffirm its approval of the Project in the Authorization Order after performing any additional analysis on an issue raised by Petitioners on appeal.

### B.    Vacatur Would Be Disruptive

Vacatur in this instance would have significant "disruptive consequences" for Commonwealth. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-151 (D.C. Cir. 1993).  Vacating the Authorization Order would disrupt a multi-billion dollar LNG infrastructure project that is an important aspect of the United States' commitment to providing our allies with reliable sources of LNG.  Moreover,

Commonwealth is at an advanced stage of technical and commercial development of the Project, and vacating the Authorization Order at this stage would hurt its ability to timely commence construction and commercial operations. Commonwealth has executed a binding, 20-year contract for the supply of 2 million tons per year of the Project's output, and has agreements in principle as to an additional 4 million tons. Vacatur here would "needlessly disrupt" Commonwealth's project and its ability to supply offtakers with needed supplies of LNG, and as it is "reasonably likely that on remand" FERC would be able to adequately respond to Petitioners' arguments vacatur would not be appropriate. *See Vecinos*, 6 F.4th at 1332.

39

## <u>CONCLUSION</u>

The petitions for review should be denied.


Respectfully submitted,


*/s/ John Longstreth*

John Longstreth
David L. Wochner
Timothy J. Furdyna
K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
Phone: 202.778.9000
Email: john.longstreth@klgates.com


*Counsel for Respondent-
Intervenor Commonwealth LNG, LLC*


Date: October 27, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Circuit Rule 32(e)(2) because it contains 8,905 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Times New Roman 14-point font.

Respectfully submitted,

*/s/ John Longstreth*

John Longstreth
K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
Phone: 202.778.9000
Email: john.longstreth@klgates.com

*Counsel for Respondent-*
*Intervenor Commonwealth LNG, LLC*

October 27, 2023

## **CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that, on October 27, 2023, I electronically filed the foregoing *Brief for Respondent-Intervenors* with the Clerk of the Court for the U.S. Court of Appeals for the D.C. Circuit using the appellate CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

*/s/ John Longstreth*